1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9  DISCOVERORG HOLDINGS, LLC,

10                              Plaintiff,          Case No. _____

11         v.                                        **COMPLAINT FOR DAMAGES
                                                     AND INJUNCTIVE RELIEF**
12  WILLIAM KAPNER, DENNIS ARNDT, and
    TITANHOUSE, INC.,
13
                                Defendants.
14

15         Plaintiff DiscoverOrg Holdings, LLC ("DiscoverOrg Holdings"), by and through its

16  undersigned counsel, alleges as follows:

17                              **I. PARTIES**

18         1.      Plaintiff DiscoverOrg Holdings, LLC is the parent company of DiscoverOrg, LLC

19  ("DiscoverOrg"), DiscoverOrg, Inc. (formerly known as Rain King Software, Inc.)

20  ("RainKing"), and RSKI HoldCo, Inc. (collectively, the "DiscoverOrg Entities").  DiscoverOrg

21  Holdings, LLC is authorized to bring claims on behalf of all the DiscoverOrg Entities.

22  DiscoverOrg Holdings is a Delaware limited liability company with its principal place of

23  business in Vancouver, Washington.

24         2.      DiscoverOrg is a technology company that uses proprietary analytics and

25  advanced research methods to gather and catalogue contact and context data on business

26  professionals and executives.  DiscoverOrg licenses that data to corporate clients for sales,

27

COMPLAINT - 1

710004.0008/7148699.1

marketing, and recruiting.  RainKing curates and licenses a similar database, and was acquired by DiscoverOrg on August 25, 2017.

3.      Defendant William Kapner ("Kapner") is an individual and, upon information and belief, resides in Leesburg, Virginia.  He is the founder and former CEO of RainKing.  He is also the founder and CEO of TitanHouse, Inc.

4.      Defendant Dennis Arndt ("Arndt") is an individual and, upon information and belief, resides in Leesburg, Virginia.  He was the Chief Technology Officer of RainKing and DiscoverOrg for almost four years.

5.      Defendant TitanHouse, Inc. ("TitanHouse") is, upon information and belief, a Delaware corporation with its principal place of business in Bethesda, Maryland.  Like DiscoverOrg and RainKing, TitanHouse purports to use analytics and advanced research methods to gather and catalogue contact and context data on business professionals and executives.

## II.  JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 through a trade secret misappropriation claim under the Defend Trade Secrets Act of 2016.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 because all claims in suit are so related that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper in the U.S. District Court for the Western District of Washington because a substantial part of the events giving rise to the claims occurred in this District and all Defendants have committed intentional acts that had intended effects within the Western District of Washington, including at DiscoverOrg's principal place of business in Vancouver, Washington.  Further, Arndt signed a Separation Agreement (described below) that contains a forum selection clause, stating in part, "[e]ach party irrevocably agrees to submit to the personal jurisdiction of the state and federal courts situated within the State of Washington for purposes of any action arising from this Agreement.  The aforesaid courts shall have exclusive jurisdiction over any proceeding relating to this Agreement."

COMPLAINT - 2

### III.  FACTUAL BACKGROUND

**A.      Kapner Founded RainKing and Served as Its CEO for Almost Eight Years.**

8.      Upon information and belief, Kapner founded RainKing in January 2008.  He served as the CEO of RainKing from January 2008 until September 2015.

9.      In that role, Kapner knew of and had access to all of RainKing's trade secrets, confidential information, and proprietary methods and techniques.

10.      Upon departing the company September 2015, Kapner entered into a restrictive covenant agreement ("Kapner RCA") where he agreed to, among many things, refrain from owning or working with any entity "whose business, activities, products or services are competitive with [RainKing's] business of providing contact data on technology and marketing executives and data on technology systems utilized by organizations" or "otherwise engag[ing] in any other business activity which is competitive with the Existing Business" for a period of three years.  He also agreed not to "directly or indirectly, retain or employ any employee of [RainKing], or solicit, induce or attempt to solicit or induce any employee of the Company to leave his or her employment for a period of two years after the Closing Date."  He further agreed to hold all knowledge and information "of a non-public, secret or confidential nature" that was related to RainKing's business in confidence.

**B.      Arndt Was RainKing and DiscoverOrg's Chief Technology Officer for Almost Four Years.**

11.      On or about February 2014, Arndt became RainKing's Chief Technology Officer.

12.      Upon his hiring, RainKing issued a press release on February 28, 2014, describing Arndt's role in RainKing's strategic plans as follows:

> "Real growth demands rethinking and overhauling existing business models – this is hard and takes experienced and talented leadership," explains RainKing CEO Bill Kapner.  "Dennis brings this to our company and we are delighted and honored to have him aboard."  Dennis is immediately tasked with polishing off and releasing RainKing V3, a new operating platform for customers with a brand new, modern interface and exciting functionality.  He

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

710004.0008/7148699.1

is also building the systems to enable the rapid growth and delivery of new products, services, datasets and data partnerships.

13.     Upon information and belief, as CTO of RainKing Arndt was responsible for managing the company's technological product development and its internal information technology department.  After RainKing was acquired by DiscoverOrg on August 25, 2017, he became responsible for managing the technology product development team for both companies. In that role, Arndt was in charge of the software development team that develops and maintains the companies' proprietary databases, internal and external user interfaces, third-party software integrations, data processing software, and other proprietary software that forms the technological foundation of the companies' products.

14.     As a material part of and express condition to DiscoverOrg's agreement to acquire RainKing, DiscoverOrg required certain high-level RainKing employees ("Key Employees") to sign restrictive covenant agreements ("RCAs") with, among other provisions, a non-competition clause.  Arndt was included in that group of Key Employees.  But for the execution of RCAs by all Key Employees, including Arndt, DiscoverOrg would not have agreed to the acquisition because it deemed non-competition provisions with regard to such employees necessary to protect the value of the companies' proprietary technology and methods.  The value of DiscoverOrg's technology, methods, and the company itself is related to and dependent upon the proprietary and non-public nature of its trade secrets and related methodologies, which derive independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use.  Many of the Key Employees, including Arndt, had good reason to agree to the RCA so that the acquisition could occur, because they stood to receive substantial payments for certain equity interests as part of the acquisition. Indeed, Arndt received a distribution of more than $1.78 million in connection with DiscoverOrg's acquisition of RainKing.

15.     On August 25, 2017, Arndt signed the RCA ("Arndt RCA") with DiscoverOrg and became Chief Technology Officer of DiscoverOrg (prior to the closing of the acquisition,

COMPLAINT - 4

DiscoverOrg verbally offered Arndt a position as CTO of both companies post-acquisition).  A copy of the Arndt RCA is attached as **Exhibit 1**.  During his approximately two months as CTO of DiscoverOrg, Arndt assumed the management of DiscoverOrg's product development and engineering teams, had access to all of DiscoverOrg's technology and internal systems, and was involved in numerous extensive high-level discussions with other executives and the DiscoverOrg's product development and data science personnel regarding existing proprietary methods and technologies, as well as plans for the development of new methods and technologies for gathering, cataloging, and analyzing data.

16.     The Arndt RCA includes, among other things, the following terms:

a.     Arndt acknowledges that he has received valuable detailed knowledge of RainKing's business, intellectual property, and other confidential and proprietary information, and has gained substantial knowledge and expertise in connection with RainKing's operations, organization, and customers;

b.     Arndt acknowledges that it would be detrimental to DiscoverOrg if he were to disclose or misuse DiscoverOrg's confidential information;

c.     Arndt agrees not to engage, participate, assist, or invest in any entity, business, or enterprise that is engaged in a "Competing Business" for a period of two years after his employment with DiscoverOrg ceases;

d.     Arndt agrees not to solicit, accept, or conduct any business from or with any of DiscoverOrg's customers or prospective customers that involves "Marketable Data Activities" for a period of two years after his employment with DiscoverOrg ceases; and

e.     Arndt agrees not to directly or indirectly solicit any employee or consultant of any DiscoverOrg to leave DiscoverOrg.

17.     The Arndt RCA defines "Marketable Data Activities" as the "gathering, cataloging, marketing, selling, or providing contact data on business professionals and/or executives; profiling business organizations as to their installed technologies, personnel, projects, or purchasing behaviors or intentions; or providing call or email sequencing or account

COMPLAINT - 5

prioritization software," when the activity is done "primarily for sales, marketing, or recruiting purposes."

18.     The Arndt RCA defines a "Competing Business" as (1) any business that is involved in Marketable Data Activities; or (2) any other business actively conducted by DiscoverOrg in which Arndt was involved in any material respect.

19.     On October 19, 2017, DiscoverOrg terminated Arndt's employment for cause.

20.     As part of Arndt's termination, DiscoverOrg (through RainKing) entered into a Separation Agreement with Arndt on October 31, 2017.  A copy of the Separation Agreement is attached as **Exhibit 2**.

21.     The Separation Agreement provided, among other things, for the following:

a.     Arndt agrees that RainKing will pay him $159,000 to which he was otherwise not entitled; and

b.     Arndt agrees that he will never disclose to any person or entity any confidential or proprietary information of or about RainKing.

22.     Further, the Separation Agreement expressly incorporated the Arndt RCA:

> **5. Continuing Obligations.**  [Arndt] continues to be bound by certain provisions of his employment agreement dated September 22, 2015 (the "Employment Agreement") and the Restrictive Covenant Agreement dated August 25, 2017 (the "RCA"), including the non-competition, non-solicitation, and confidentiality provisions thereof (the "Continuing Obligations"). The obligations of [Arndt] created by this Agreement are in addition to and do not replace the Continuing Obligations.

**C.     Kapner and Arndt Have Been Collaborating In Violation of Their Contractual Obligations to Misappropriate RainKing and DiscoverOrg Trade Secrets.**

23.     In violation of his RCA, Kapner founded TitanHouse, Inc. sometime in 2016.

24.     Though the Kapner RCA prohibits him working with or owning any "business, activities, products or services that are competitive with the [RainKing's] business of providing contact data on technology and marketing executive," until September 2015, TitanHouse does just that.   As explained on the TitanHouse website, "TitanHouse curators use analytics and

COMPLAINT - 6

advanced research to identify and profile the world's most talented executives." That research is then sold to "CEOs, high-end recruiters, and PE firms" who "use TitanHouse to find extraordinary leaders for senior leadership, board positions, and consulting and advisory projects."

25.     Unbeknownst to RainKing and DiscoverOrg, Kapner began communicating with Arndt at least as early as September 2016 about assisting with the development process at his new data services company.

26.     Kapner and Arndt continued their discussions in December 2016 and January 2017, communicating by email and meeting in person to discuss potential TitanHouse branding.

27.     In February 2017, Jim Keeney, a web consultant, wrote to Arndt and indicated that he was working with TitanHouse and was "trying to optimize the handling of profile pictures." He went on to write: "Bill suggested that you had developed a better process for handling Headshot photos at Rain King. Do you have some time this week for a quick phone call to go over the process you developed?" Arndt indicated that he had time the following day to discuss.

28.     In June 20, 2017, Kapner emailed Arndt to introduce his CFO, Gary Guttman, and to ask Arndt to discuss questions Guttman had about "best practices for access control and permissions for researchers and other employees."

29.     On November 20, 2017, Arndt, writing from his TitanHouse email account, contacted four current DiscoverOrg employees, all individuals who worked for him when he was CTO. Though the email was directed primarily to their personal accounts, DiscoverOrg became aware of the communication because one of the recipients received the email on his DiscoverOrg corporate email account. The email states: "Just got through chatting with my CFO regarding what we need so we can start paying you for your services. Please fill out the attached doc's and send back to me so I can submit to Gary my CFO." The email is entitled "Getting you paid." It attached a W-9 and a document entitled "Sample Invoice for RK." The "Sample Invoice"

COMPLAINT - 7

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

710004.0008/7148699.1

contains a notation reflecting three hours of work by DiscoverOrg employee Filip Popovic for "Setup Elastic Search."  Elastic search is a technical term related to search term technology.

30.     On November 20, 2017, Arndt sent an email to Anthony Stark ("Stark"), DiscoverOrg's General Counsel, from the email address darndt@titanhouse.com.  At the bottom of Arndt's message was the following signature block: "Dennis Arndt, Chief Technology Officer, TitanHouse, www.titanhouse.com."  This was the first time DiscoverOrg became aware that Arndt had begun working for TitanHouse.

31.     On information and belief, Arndt's position as Chief Technology Officer at TitanHouse is substantially the same role as Arndt's previous employment with DiscoverOrg (and RainKing prior to the acquisition), where he was also the Chief Technology Officer for over three years.

32.     Due to his years of work as CTO of RainKing, and his time at DiscoverOrg, Arndt has intimate knowledge of the specific ways that RainKing and DiscoverOrg have approached and overcome challenges in the data business, particularly those that relate to unique difficulties of acquiring, cataloging, and analyzing data for use by corporate clients.  Curating a database of executives across different industries and different companies in a way that can be consumed requires techniques for identifying key data points and normalizing them across the database, as just one example.  DiscoverOrg and RainKing were pioneers in this space, and Arndt was a key piece of that for many years, which was a primary reason DiscoverOrg required him to execute the Arndt RCA prior to investing millions of dollars in RainKing.  Arndt was familiar not only with the ways the companies address those issues now, but was involved in high-level and highly-sensitive meetings discussing new methods of data collection, analysis, and cataloging.  The disclosure of such methods and/or the use of that information by a competitor could be damaging to DiscoverOrg and RainKing in ways that would be impossible to undo.

33.     Given the similarity of Arndt's role and the business model of TitanHouse, it was extremely likely that Arndt would disclose DiscoverOrg's confidential information and trade secrets to TitanHouse and, at minimum, use sensitive and proprietary information and knowledge

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

710004.0008/7148699.1

gained through working for RainKing and DiscoverOrg to benefit and improve TitanHouse's products to DiscoverOrg's competitive disadvantage.

34.     The communications between Arndt and Kapner and between Arndt and other DiscoverOrg employees demonstrates that exfiltration of RainKing and DiscoverOrg trade secrets and other proprietary information has already taken place.

35.     Arndt's employment with TitanHouse and ongoing communications with current DiscoverOrg employees is in knowing contravention of the Separation Agreement and Arndt RCA.

36.     Kapner's ownership and employment with TitanHouse and ongoing recruitment of DiscoverOrg employees is in knowing contravention of the Kapner RCA.

**D.     Notice to Arndt.**

37.     On November 21, 2017, the day after DiscoverOrg learned that Arndt was working for TitanHouse, DiscoverOrg wrote to Arndt, reminding him of his obligations under the Separation Agreement and RCA and explaining that his TitanHouse employment violated both agreements.

38.     DiscoverOrg also explained that it would give Arndt until November 27, 2017, to confirm in writing that he had ceased his TitanHouse employment.  If Arndt failed to cease his TitanHouse employment, DiscoverOrg explained that it would seek a temporary restraining order and injunctive relief, as well as other relief, to enforce the Separation Agreement and RCA and enjoin the irreparable harm that Arndt's breach imposed on DiscoverOrg.

39.     On November 27, 2017, counsel for Arndt and TitanHouse notified counsel for DiscoverOrg that they did not believe the Arndt RCA applied to Arndt's employment as Chief Technology Officer for TitanHouse.  They also refused to confirm whether either Arndt or TitanHouse had taken efforts to preserve relevant documents related to Arndt's employment or the use or potential use of any trade secrets.

COMPLAINT - 9

## FIRST CAUSE OF ACTION

### Breach of Contract – Restrictive Covenant Agreement (Arndt)

40.     DiscoverOrg incorporates by reference all preceding paragraphs.

41.     The Arndt RCA is an enforceable agreement between DiscoverOrg and Arndt.

42.     Arndt has breached the RCA by working or preparing to work at TitanHouse as a Chief Technology Officer because TitanHouse is a Competing Business and Arndt will be engaging in Marketable Data Activities or other business actively conducted by DiscoverOrg in which Arndt was involved in a material respect.

43.     On information and belief, Arndt has also breached the non-solicitation provisions of the RCA, which provides, in part, that Arndt "will not, directly or indirectly, in any manner, solicit, entice, attempt to persuade any employee or consultant of any DiscoverOrg Party to leave such DiscoverOrg Party (as applicable) for any reason."

44.     DiscoverOrg has and continues to suffer damages as a result of Arndt's breach in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Breach of Contract – Separation Agreement and Release (Arndt)

45.     DiscoverOrg incorporates by reference all preceding paragraphs.

46.     The Separation Agreement is an enforceable agreement between DiscoverOrg and Arndt that expressly incorporates the RCA.

47.     Arndt has breached the Separation Agreement by working or preparing to work at TitanHouse as a Chief Technology Officer because TitanHouse is a Competing Business and Arndt will be engaging in Marketable Data Activities or other business actively conducted by DiscoverOrg in which Arndt was involved in a material respect.

48.     DiscoverOrg has and continues to suffer damages as a result of Arndt's breach in an amount to be proven at trial.

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

**THIRD CAUSE OF ACTION**

**Misappropriation Under the Defend Trade Secrets Act**

**(18 U.S.C. Chapter 90) (All Defendants)**

49.     DiscoverOrg incorporates by reference all preceding paragraphs.

50.     Arndt acknowledged in his RCA that he had "detailed knowledge of the Company's Business, intellectual property and other confidential and proprietary information and [had] gained substantial knowledge and expertise in connection with the Company's operations, organization and customers" and that "it would be detrimental" to DiscoverOrg if he was to "engage in certain activities involving disclosure or misuse of confidential information, competition, or solicitation following the Closing."

51.     In his Separation Agreement, Arndt further agreed "never to disclose to any person or entity any confidential or proprietary information of or about RainKing, except upon the prior express written authorization and consent of RainKing's CEO." The Separation Agreement defined confidential and proprietary information to include, but not be limited to, "financial information or reports, policies, procedures, forms, customer information or lists, techniques, training, trade secrets, programs, intellectual property, and business concepts, plans, opportunities, projects, reports or records."

52.     Since signing the Separation Agreement, Arndt has neither sought nor been given written authorization by the CEO of RainKing to disclose proprietary or confidential information.

53.     In his RCA, Kapner agreed to hold all knowledge and information "of a non-public, secret or confidential nature" that was related to RainKing's business in confidence.

54.     RainKing and DiscoverOrg have made substantial investments in infrastructure and resources to support, develop, and protect its proprietary database and the trade secrets and confidential methodologies that underlie it.

55.     The value of DiscoverOrg's technology and the company itself is related to and dependent upon the proprietary and non-public nature of its trade secrets and related methodologies. DiscoverOrg's technology, methods, and related information derive independent

COMPLAINT - 11

economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use.  Accordingly, DiscoverOrg takes steps to protect the security of the information contained in its database and restricts access to the technology and methodologies underlying it.  These steps include requiring key employees such as Kapner and Arndt to sign restrictive covenant agreements and to agree to strict confidentiality provisions when they depart the company.

56.    Arndt and Kapner knew that they were subject to various duties to maintain the secrecy of and limit the use of DiscoverOrg and RainKing's trade secrets and knew the value of the same.  Arndt and Kapner acquired DiscoverOrg and RainKing's trade secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

57.    Upon information and belief, Arndt misappropriated DiscoverOrg and RainKing's trade secrets when he used trade secrets without the express or implied consent of DiscoverOrg when he disseminated trade secrets to Kapner and other TitanHouse employees while employed by RainKing and DiscoverOrg and when he took on the job of Chief Technology Officer at TitanHouse.  Arndt acquired those trade secrets through improper means and accessed and disclosed them without DiscoverOrg's consent.

58.    Upon information and belief, Kapner and TitanHouse misappropriated RainKing's trade secrets when each used trade secrets without the express or implied consent of RainKing or DiscoverOrg when Kapner disseminated trade secrets to other TitanHouse employees and solicited trade secret material from existing DiscoverOrg employees.  Kapner acquired those trade secrets through improper means and accessed and disclosed them without DiscoverOrg's consent.

59.    Arndt knew that his use of DiscoverOrg and RainKing's trade secrets was improper because of his contractual agreements and the cease and desist letter he received from DiscoverOrg's counsel on November 21, 2017.

60.    Kapner and TitanHouse knew that its use of DiscoverOrg and RainKing's trade secrets was improper because of Kapner's contractual agreements, his fiduciary obligations while

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100  FAX: 503.778.2200

710004.0008/7148699.1

CEO of RainKing, and the cease and desist letter TitanHouse's counsel received from DiscoverOrg's counsel on November 21, 2017.

61.     Defendants' conduct constitutes willful and malicious trade secret misappropriation and has damaged DiscoverOrg.

## FOURTH CAUSE OF ACTION

### Misappropriation of Trade Secrets Under RCW 19.108 (All Defendants)

62.     DiscoverOrg incorporates by reference all preceding paragraphs and specifically those contained in paragraphs 50-61 above.

## PRAYER FOR RELIEF

DiscoverOrg prays for the following relief:

1.     For DiscoverOrg's actual damages in an amount to be proven at trial;

2.     For DiscoverOrg's attorneys' fees and costs as authorized by the RCAs and the Separation Agreement;

3.     For a preliminary and permanent injunction enjoining defendant Arndt from continuing employment at TitanHouse, enjoining all defendants from soliciting current DiscoverOrg employees, and from any further disclosure or dissemination of confidential and proprietary information; and

4.     For other such relief as the Court deems just and proper.

DATED:  December 5, 2017

LANE POWELL PC


By   s/Darin M. Sands
         Darin M. Sands, WSBA 35865
         sandsd@lanepowell.com
         Telephone: 503.778.2100
         Facsimile: 503.778.2200

By   s/ David W. Howenstine
         David W. Howenstine, WSBA 41216
         howenstined@lanepowell.com
         Telephone: 206.223.7000
         Facsimile:  206.223.7107

COMPLAINT - 13

# EXHIBIT 1

## RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement (the "Agreement") is entered into this 25th day of August, 2017, by and among (i) RKSI Acquisition Corporation, a Delaware corporation ("Purchaser"); (ii) DiscoverOrg Holdings, LLC, a Delaware limited liability company and indirect parent of Purchaser ("Parent"); (iii) RKSI HoldCo Inc., a Delaware corporation (together with its Subsidiaries, the "Company"); and (iv) Dennis Arndt, an individual residing in the State of Virginia (the "Key Employee"). Parent and its Subsidiaries, including, but not limited to Purchaser and the Company (following the Closing), are sometimes individually referred to in this Agreement as a "DiscoverOrg Party" and collectively the "DiscoverOrg Parties." The Key Employee, Purchaser, Parent and the Company are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties." Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to them in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, reference is hereby made to that certain Purchase Agreement, dated on or about the date hereof (the "Purchase Agreement"), by and among Purchaser, the Company, the Sellers (as defined therein) and the Sellers' Representative (as defined therein), pursuant to which, among other things, Purchaser is acquiring all of the outstanding capital stock of the Company from the Sellers;

**WHEREAS**, the Key Employee is a senior executive of the Company;

**WHEREAS**, the Key Employee has detailed knowledge of the Company's Business, intellectual property and other confidential and proprietary information and has gained substantial knowledge and expertise in connection with the Company's operations, organization and customers;

**WHEREAS**, the Parties acknowledge that it would be detrimental to the DiscoverOrg Parties if the Key Employee were to engage in certain activities involving disclosure or misuse of confidential information, competition, or solicitation following the Closing;

**WHEREAS**, as a material inducement for Purchaser and the Company to enter into the Transactions contemplated by the Purchase Agreement, the Key Employee has agreed to enter into this Agreement; and

**WHEREAS**, the Key Employee acknowledges and agrees that he will materially benefit from the Transactions contemplated by the Purchase Agreement and that this Agreement and his covenants are supported by good and sufficient consideration.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.     Effective Date; Termination.  This Agreement shall be effective as of and subject to the Closing of the Transactions contemplated by the Purchase Agreement (the "Effective Date"). If the Closing does not occur, this Agreement shall be null and void for all purposes.

2.      <u>Noncompetition and Nonsolicitation</u>.

(a)      During the period commencing on the Effective Date and terminating on the later of (x) the second (2nd) anniversary of the Effective Date and (y) two (2) years following the date on which the Key Employee's employment with the DiscoverOrg Parties is terminated (the "<u>Restricted Period</u>"), the Key Employee (i) will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate, assist or invest or actively prepare to engage, participate, assist or invest in that part of any entity, business or enterprise that is engaged in a Competing Business (as hereinafter defined); (ii) will not, for the benefit of any Competing Business, directly or indirectly, in any manner, other than for the benefit of any DiscoverOrg Party, call upon, solicit, divert, take away, accept or conduct any business from or with any of the customers or prospective customers of any DiscoverOrg Party or any of their respective suppliers if doing so involves Marketable Data Activities; and (iii) will not, directly or indirectly, in any manner, solicit, entice, attempt to persuade any employee or consultant of any DiscoverOrg Party to leave such DiscoverOrg Party (as applicable) for any reason; <u>provided</u>, that the foregoing shall not be deemed to prohibit Key Employee from engaging in general media advertising or general employment solicitation that is not targeted towards any employee or consultant of any DiscoverOrg Party; <u>provided</u>, <u>further</u>, that (A) if an employee of any DiscoverOrg Party responds to such media advertising or general employment solicitation request, the Key Employee cannot further solicit such employee and (B) <u>Section 2(a)(i)</u> shall not prohibit the Key Employee from serving in a role for a Competing Business that does not directly or indirectly involve Marketable Data Activities, provided that the Key Employee provides not less than thirty (30) days advance written notice to the Chief Executive Officer and the General Counsel of the Company of the Key Employee's intentions, the name of the Competing Business, the Key Employee's proposed title, role, start date and duties.  The DiscoverOrg Parties shall not unreasonably refuse such request, and shall notify the Key Employee in writing of their position within ten (10) business days of receipt of the request.

(b)      For purposes of this Agreement, the term "<u>Competing Business</u>" shall mean any business, as such business is being conducted by the Company as of the date of this Agreement, in any of the following: (i) primarily for sales, marketing, or recruiting purposes: gathering, cataloging, marketing, selling, or providing contact data on business professionals and/or executives; profiling business organizations as to their installed technologies, personnel, projects, or purchasing behaviors or intentions; or providing call or email sequencing or account prioritization software (by way of example, businesses covered by clause (i) include, but are not limited to, ZoomInfo, Dun & Bradstreet, Data.com, LinkedIn, LeadGenius, HG Data, Datanyze, Salesloft, Outreach) (collectively the activities in clause (i) are referred to herein as "<u>Marketable Data Activities</u>"); and (ii) any other business actively conducted by any DiscoverOrg Party or in an active phase of development at any DiscoverOrg Party as of the date of termination of the Key Employee's employment with the DiscoverOrg Parties and in which the Key Employee was involved in any material respect; <u>provided</u>, <u>however</u>, that Competing Business shall not include any investment by the Key Employee, directly or indirectly, solely as an investor (x) in publicly traded stock of a company representing less than two percent (2%) of the stock of such company, or (y) in mutual funds, exchange traded funds or similar investment or alternative investment vehicles, in each case, investing in public market securities.

(c)      The restrictions in this <u>Section 2</u> shall apply to any conduct involving Marketable Data Activities in the following "<u>Geographic Area</u>": (i) the United States of America; (ii) any geographic area in which any DiscoverOrg Party has sold during the Key Employee's employment with the DiscoverOrg Parties, is then selling as of the date of termination of the Key Employee's employment with the DiscoverOrg Parties, or is actively planning to sell its products or services as of the date of termination of the Key Employee's employment with the DiscoverOrg Parties; and (iii) any other geographic area in which any DiscoverOrg Party has operated during the Key Employee's employment with the DiscoverOrg Parties, is then operating as of the date of termination of the Key Employee's

ACTIVE/91406066.7

employment with the DiscoverOrg Parties or is, to the knowledge of the Key Employee, actively planning to operate its business as of the date of termination of the Key Employee's employment with the DiscoverOrg Parties.

(d)     The Key Employee acknowledges and agrees that if the Key Employee violates any of the provisions of this Section 2, the running of the Restricted Period will be extended by the time during which the Key Employee engage in such violation(s)

(e)     The Key Employee understands that the restrictions set forth in this Section 2 are intended to protect the interest of the DiscoverOrg Parties in their confidential information, goodwill and established employee, customer, supplier, consultant and vendor relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.   The Key Employee also acknowledges and agrees he is a Key Employee (as defined in the Purchase Agreement) and absent the Key Employee's agreement to and compliance with the restrictions set forth in this Section 2, the DiscoverOrg Parties would not have entered into the Transactions contemplated by the Purchase Agreement.

3.     Remedies.   The Key Employee acknowledges that the restrictions contained in this Agreement are reasonable and necessary to protect the legitimate business interests of the DiscoverOrg Parties and that any violation of the provisions contained herein would result in irreparable injury to the DiscoverOrg Parties and that monetary damages may not be sufficient to compensate the DiscoverOrg Parties for any economic loss which may be incurred by reason of breach of the restrictions contained herein.   In the event of a breach or a threatened breach by the Key Employee of any provision contained herein, any DiscoverOrg Party, as applicable, shall be entitled to a temporary restraining order and injunctive relief restraining the Key Employee from the commission of any breach, provided all of the elements required by law for obtaining such equitable relief are met.   The prevailing Party in such action shall be entitled to recover its/his reasonable attorneys' fees, costs and expenses from the non-prevailing Party.   Nothing contained in this Section 3 shall be construed as prohibiting any DiscoverOrg Party from pursuing any other remedies available to it for any breach or threatened breach, including, without limitation, the recovery of money damages.   Notwithstanding the foregoing, in the event of any violation or alleged violation of Section 2(a)(i) related to or arising out of investments by the Key Employee, the DiscoverOrg Parties shall give to the Key Employee written notice that such investment constitutes a violation of Section 2(a)(i) and afford the Key Employee a reasonable period of time in which to liquidate such investment as a condition to exercising any remedies against the Key Employee under this Agreement, it being understood that the Parties wish to avoid any unintentional or inadvertent violations of Section 2(a)(i) resulting from the Key Employee's investment activities.

4.     Enforceability.   If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement) shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.   The covenants contained in this Section 2 shall be construed as a series of separate covenants, one for each city, county, state, country or any similar subdivision in any Geographic Area.   These covenants shall also be construed as a series of separate and successive covenants, one for each month of the Restricted Period.   Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the respective covenant contained in Section 2 above.   If, in any judicial or arbitral proceeding, a court or arbitrator refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced.   In the event that the provisions of Section 2 above are

3

deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by such law.  In the event that the applicable court or arbitrator does not exercise the power granted to it in the prior sentence, the Parties shall negotiate in good faith to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

5.      Waiver.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving Party.  The failure of any Party to require the performance of any term or obligation of this Agreement, or the waiver by any Party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

6.      Amendment.  This Agreement may be amended or modified only by a written instrument signed by the Key Employee and by a duly authorized representative of each DiscoverOrg Party.

7.      Consent to Jurisdiction.  The parties hereby consent to the jurisdiction of the state and federal courts located in the State of Virginia.  Accordingly, with respect to any such court action, the Executive (a) submits to the personal jurisdiction of such courts; (b) consents to service of process; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.

8.      Governing Law.  This shall be construed in accordance with and governed by the laws of the State of Virginia, without regard to principles of conflict of laws.

9.      Successor to any DiscoverOrg Party.  This Agreement shall inure to the benefit of and be enforceable by any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of any DiscoverOrg Party.

10.     Integration.  Other than the Purchase Agreement, this Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior written or oral agreements between the parties concerning such subject matter.

11.     Gender Neutral.  Wherever used herein, a pronoun in the masculine gender shall be considered as including the feminine gender unless the context clearly indicates otherwise.

12.     Counterparts and Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall be considered one and the same instrument, and this Agreement may be executed by facsimile or PDF and a facsimile or PDF copy of a signature shall be deemed an original.

*Remainder of the page intentionally left blank.*

IN WITNESS WHEREOF, the Parties have executed this Agreement, effective as of the Effective Date and subject to the consummation of the Transactions contemplated by the Purchase Agreement.

<u>**KEY EMPLOYEE**</u>:

**Dennis Arndt**

IN WITNESS WHEREOF, the Parties have executed this Agreement, effective as of the Effective Date and subject to the consummation of the Transactions contemplated by the Purchase Agreement.

**PARENT:**

**DISCOVERORG HOLDINGS, LLC**

By:_____
Name: Henry Schuck
Title: President and Chief Executive Officer

**PURCHASER:**

**RKSI ACQUISITION CORPORATION**

By:_____
Name: Henry Schuck
Title: President and Chief Executive Officer

**COMPANY:**

**RKSI HOLDCO INC.**

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the Parties have executed this Agreement, effective as of the Effective Date and subject to the consummation of the Transactions contemplated by the Purchase Agreement.

**PARENT:**

**DISCOVERORG HOLDINGS, LLC**

By: _____

Name: _____

Title: _____

**PURCHASER:**

**RKSI ACQUISITION CORPORATION**

By: _____

Name: _____

Title: _____

**COMPANY:**

**RKSI HOLDCO INC.**

By: _____

Name: John Stanfill

Title: Chief Executive Officer

# EXHIBIT 2

**Separation Agreement and Release**

This Separation Agreement and Release (herein after, the "Agreement") is made and entered into by and between Rain King Software, Inc., a Delaware corporation, and its affiliates (collectively, "RainKing") and Dennis Arndt ("Employee") as of the earliest date upon which both parties have executed the same.

Employee has been an employee of RainKing and, as a result of RainKing's determination, after an investigation, that Employee has violated RainKing's company policy, Employee's employment is terminated as of October 19, 2017. In order to provide for certain promises to the company on behalf of Employee, and in exchange for certain benefits to which he would not otherwise be entitled, Employee and RainKing agree as follows:

<u>Terms</u>

**1. Termination.** Employee's employment with RainKing is terminated effective October 19, 2017 (the "Termination Date").

**2. Severance Payment and Continuing Obligations.**

**2.1** In consideration of this Agreement, and provided that the release set forth herein becomes effective and irrevocable, RainKing agrees to pay Employee $159,000.00 to which Employee would not otherwise be entitled (the "severance payment").

**2.2** One half of the severance payment shall be payable after the conclusion of the revocation period provided in section 19 hereof or January 3, 2018, whichever is later. The remaining one half shall be payable on the date that is six months after conclusion of the revocation period provided in section 19 provided that Employee has not earlier violated any provision of this Agreement.

**2.3** Employee understands and acknowledges that RainKing will pay him the compensation he has earned through the Termination Date even if he does not sign this Agreement. Employee further understands that the severance payment is subject to mandatory state and federal payroll deductions. Employee further understands and acknowledges that he continues to be bound by certain obligations pursuant to his employee confidentiality agreement, including the obligation to return any company property within Employee's possession.

**3. COBRA.** Employee hereby acknowledges that RainKing has advised him that pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) he has a right to elect continued coverage under RainKing's group health plan, at his own expense, for a period of eighteen months from the date of termination, regardless of whether he signs this Agreement. Such election must be made no later than sixty days after that date.

**4. Release of Claims.** In consideration of the severance payment and other promises contained herein, and as a material inducement to RainKing to enter this Agreement, Employee hereby irrevocably and unconditionally releases, acquits, and forever discharges RainKing and its assigns, agents, directors, officers, employees, representatives, attorneys, parent companies (including DiscoverOrg), divisions, subsidiaries, successors, affiliates (and agents, directors, officers, employees, representatives, and attorneys of such parent companies, divisions, subsidiaries, and affiliates), and all persons acting by, though, under, or in concert with any of them (hereinafter "the Releasees"), from any and all claims, demands, or liabilities whatsoever, whether known or unknown, or suspected to exist by Employee, which Employee ever had or may now have against the Releasees, or any of them,


Initial

including without limitation any claims, demands, or liabilities (including attorneys' fees and costs actually incurred) related to, arising from, or in connection with Employee's employment with RainKing and/or the termination of such employment and specifically including without limitation claims for damages from any of the laws listed in the next paragraph. This release includes, without limitation, all claims: relating to Employee's employment by the RainKing and the decision to terminate Employee's employment; of wrongful discharge or violation of public policy; of breach of contract; of defamation or other torts; of retaliation or discrimination under federal, state or local law (including, without limitation, claims of discrimination or retaliation under the Age Discrimination in Employment Act, the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, the Washington Law Against Discrimination (Ch. 49.60 RCW), the Illinois Human Rights Act (if applicable), Massachusetts General Laws c. 151B (if applicable),  the Texas Anti-Retaliation Act (if applicable), and Maryland anti-discrimination and anti-retaliation laws); under any other federal or state statute (including, without limitation, Claims under the Fair Labor Standards Act, WARN or analogous state law, the Family and Medical Leave Act, or any other federal or state family and medical leave law); for wages, bonuses, incentive compensation, commissions, stock, stock options, vacation pay or any other compensation or benefits (either under Maryland law, the Washington Minimum Wage Act (Ch. 49.46 RCW), the Washington Wage Payment Act (Ch. 49.48 RCW), the Massachusetts Wage Act (M.G.L. c. 149, §§148-150C) (if applicable), the Texas Labor Code (if applicable), Illinois state law (if applicable), or otherwise); and for damages or other remedies of any sort, including, without limitation, compensatory damages, punitive damages, injunctive relief and attorney's fees; provided, however, that this release shall not affect Employee's rights under this Agreement or rights that cannot be released as a matter of law. Employee agrees not to accept damages of any nature, other equitable or legal remedies for Employee's own benefit or attorney's fees or costs from any of the Releasees with respect to any claim released by this Agreement. As a material inducement to RainKing to enter into this Agreement, Employee represents that Employee has not assigned any claim to any third party.

**Nothing in this Agreement is intended to nor shall interfere with Employee's right to participate in any proceeding with any appropriate federal, state, or local government agency enforcing discrimination laws, including Title VII of the Civil Rights Act of 1964, the Pregnancy Discrimination Act, the Equal Pay Act of 1963, the Age Discrimination in Employment Act of 1967, Title I of the Americans with Disabilities Act of 1990, sections 102 and 103 of the Civil Rights Act of 1991, sections 501 and 505 of the Rehabilitation Act of 1973, and the Genetic Information Nondiscrimination Act of 2008, nor shall this Agreement prohibit Employee from cooperating with any such agency in its investigation. But, Employee gives up any right to recover or receive any personal relief or benefit involving any action taken by a government agency. Personal relief or benefits includes attorneys' fees, monetary damages or reinstatement.**

**5. Continuing Obligations.**  Employee continues to be bound by certain provisions of his employment agreement dated September 22, 2015 (the "Employment Agreement") and the Restrictive Covenant Agreement dated August 25, 2017 (the "RCA"), including the non-competition, non-solicitation, and confidentiality provisions thereof (the "Continuing Obligations"). The obligations of Employee created by this Agreement are in addition to and do not replace the Continuing Obligations.

**6. Company Property and Trade Secrets.** Employee shall return to RainKing any and all RainKing property, and documents which he may have in his possession, and Employee shall cease accessing and refrain from accessing in the future any RainKing computer systems or networks except with the express prior written permission of RainKing's CEO. Employee agrees never to disclose to any person or entity any confidential or proprietary information of or about RainKing, except upon the prior express written authorization and consent of RainKing's CEO.  Confidential and proprietary information includes, but is not limited to financial information or reports,


Initial

policies, procedures, forms, customer information or lists, techniques, training, trade secrets, programs, intellectual property, and business concepts, plans, opportunities, projects, reports or records.

**7. Confidentiality.** Each party agrees to keep the terms of this Agreement, as well as the communications leading up to this Agreement, in strict confidence and not to disclose the same to any other person or entity except as may be required by law. Except for litigation arising out of the breach of or attempt to enforce this Agreement, this Agreement shall not be admissible as evidence in any legal proceeding. Each party further agrees to refrain from making any negative or critical remarks about the other party.

**8**. **Non-Disparagement.** Employee agrees not to make (or causing others to make) any public or private disparaging statements concerning RainKing or any of its affiliates or its or their current or former officers, directors, members, shareholders, employees or agents, including without limitation statements made to employees of RainKing or its affiliates, provided however that nothing in this Agreement shall preclude Employee from making truthful statements that are required by applicable law, regulation, or legal process.

**9. Ongoing Cooperation and Litigation Assistance:** Employee agrees to cooperate in good faith in the ongoing operations of RainKing and of its affiliates. Cooperating in good faith includes providing complete and truthful information to RainKing and its accountants, attorneys and financial consultants about matters within Employee's knowledge. Employee also agrees that, if requested by RainKing or any of its affiliates, Employee will cooperate in good faith by providing complete and truthful information and assistance to RainKing in connection with RainKing's prosecution of or defense against threatened, ongoing, or future litigation or other legal claims or proceedings involving RainKing or any of its affiliates.  Employee's reasonable expenses related to such assistance will be reimbursed by RainKing. RainKing may rescind its agreement to reimburse Employee's reasonable expenses in the event Employee's conduct resulted in the litigation and the conduct was unlawful, malicious, or grossly negligent.  RainKing will seek to accommodate employee's scheduling needs in providing such assistance.

**10. Reserved.**

**11. References.** Employee agrees that any requests for references will be directed to RainKing's human resources department, and acknowledges that responses to any requests for references may be limited to confirmation of the dates of employment and the last position held.

**12. Additional Employee Acknowledgements.**  Employee acknowledges that (1) he has not suffered any on-the-job injury for which he has not already filed a claim; (2) he has taken and has not been deprived of all leave to which he was legally entitled prior to the Termination Date; (3) he has been paid appropriately and fully for all hours worked during his employment; and (4) he knows of no potential or actual unlawful conduct or wrongdoing by RainKing or any of its affiliates under any state, federal or local law that he has not already disclosed to RainKing or any of its affiliates.

**13. No Admission of Wrongdoing.** The parties agree that this Agreement shall not in any way be construed as an admission by the Releasees of any acts of wrongdoing whatsoever against Employee or any other person.

**14. Entire agreement.** This Agreement sets forth the entire agreement between the parties hereto, and fully supersedes any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof.  However, this Agreement shall not supersede any obligations of Employee under any agreement concerning confidentiality, trade secrets, proprietary information, non-disclosure, inventions, patents, copyrights, or intellectual property that Employee previously executed, and any such provisions shall continue to remain in


Initial

full force and effect.  Employee agrees that Employee has not relied on any representation or statement, whether written or oral, other than as set forth in this Agreement.  Furthermore, no modification of this Agreement shall be binding unless in writing signed by both parties.  This Agreement shall inure to the benefit of and be binding upon the parties, their respective heirs, successors, and assigns.

**15. Unemployment Benefits.** RainKing intends to truthfully furnish information requested by the unemployment board or any other agency and to rebut false or misleading information submitted, whether requested to do so or not.

**16. Costs Related to Breach of the Agreement**.  If any suit, arbitration, or other proceeding is instituted by either party pertaining to this Agreement or performance hereunder, the prevailing party shall be entitled to its costs, expenses, and actual attorney's fees, in addition to any other relief as may be awarded.

**17. Governing Law, Jurisdiction, and Venue.** This Agreement shall be governed by the laws of the State of Washington without regard to its choice of law rules. Each party irrevocably agrees to submit to the personal jurisdiction of the state and federal courts situated within the State of Washington for purposes of any action arising from this Agreement.  The aforesaid courts shall have exclusive jurisdiction over any proceeding relating to this Agreement.

**18. Severability.**  If any provision of this Agreement is determined to be valid or unenforceable in any way, for any reason, all remaining parts and provisions of this Agreement shall remain in full force and effect, except that if the release in paragraph 4 is determined to be invalid or unenforceable, the Agreement shall be voidable by RainKing for a period of sixty (60) days following receipt of written notice of the invalidity or unenforceability.

**19. Acknowledgement and Time for Consideration.**  Employee acknowledges that that he has been given the opportunity to consider this Agreement for twenty-one (21) days from his receipt of this Agreement before signing it (the "Consideration Period"). By signing this Agreement, Employee acknowledges he has entered this Agreement knowingly and voluntarily. To accept this Agreement, Employee must return a signed original or a signed electronic PDF copy of this Agreement so that it is received by Michelle Brewer (DiscoverOrg, 805 Broadway St., Suite 900, Vancouver, WA 98660; michelle.brewer@discoverorg.com) at or before the expiration of the Consideration Period. If Employee signs this Agreement before the end of the Consideration Period, Employee acknowledges that such decision was entirely voluntary and that he has had the opportunity to consider this Agreement for the entire Consideration Period. For the period of seven (7) days from the date when Employee signs this Agreement, Employee may revoke this Agreement by written notice to Ms. Brewer. For such a revocation to be effective, it must be delivered so that it is received by Ms. Brewer at or before the expiration of the seven (7) day revocation period. This Agreement shall not become effective or enforceable during the revocation period. This Agreement shall become effective on the first business day following the expiration of the revocation period.

**20. Knowing and Voluntary Waivers.**  Employee acknowledges that Employee already has attained the age of 40 and understands that this is a full release of all existing claims whether currently known or unknown including, but not limited to, claims for age discrimination under the Age Discrimination in Employment Act.  Employee is advised to consult with an attorney, prior to signing this Agreement, regarding the meaning and application of this Agreement.  Employee agrees and acknowledges that Employee has read and understood this Agreement, and that Employee has consulted with an attorney regarding the meaning and application of this Agreement, or, if Employee has not consulted with an attorney, Employee has been advised to do so and has had ample opportunity to do so.  Employee enters into this Agreement knowingly, voluntarily, free from duress, and as a


Initial

result of Employee's own free will and with the intention to waiver, settle, and release all claims Employee has or may have against RainKing and the Releasees.

[Signature page to follow]

_____
Initial

Page 6 of 6

Each party has executed this Agreement as of the date specified below:

Signed: _____          Signed: _____
Henry L. Schuck                                              Dennis Arndt
Chief Executive Officer
Rain King Software, Inc.

Date:    10/31/2017                              Date:    October 31, 2017